(75 South. 218)

No. 21883.

ADAMS v. S. H. BOLINGER & CO., Limited.

(April 16, 1917. On Application for Rehearing, May 14, 1917.)

*(Syllabus by Editorial Staff.)*

1. MASTER AND SERVANT ⬾110—DEFECTIVE APPLIANCES—ENGINE TENDER.

Where a step on the tender of the engine of a railroad construction train, which the men were constantly using in getting on and off the train, was old, shaky, and loose, with an inward movement and lower at one end than at the other, it was negligence to leave it in this condition.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 214, 214½.]

2. MASTER AND SERVANT ⬾240(3)—CONTRIBUTORY NEGLIGENCE — BOARDING MOVING TRAIN.

Whether workmen expected to get on or off of a railroad construction train without unnecessary loss of time are negligent in boarding the train while in motion depends upon whether under the circumstances of the particular case the act is consistent with ordinary prudence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 753.]

3. MASTER AND SERVANT ⬾240(3)—CONTRIBUTORY NEGLIGENCE — BOARDING MOVING TRAIN.

It was not negligence for a member of a railroad construction crew, 27 years old and in good health, who had boarded the tender of an engine probably 100 times during the three months he had been at such work, to board the train as it was starting and moving slowly, where it appeared that it was not unusual for the workmen to get on the train while in motion.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 753.]

4. MASTER AND SERVANT ⬾234(1)—CONTRIBUTORY NEGLIGENCE—FORGETFULNESS OF DEFECT.

Even though a member of the crew of a railroad construction train knew of the defect in a step of the tender, which was old, shaky, and loose, with an inward movement and lower at one end than at the other, it was not necessarily negligence for him to forget about such defect in attempting to board the tender as the train was starting to move.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 706.]

5. MASTER AND SERVANT ⬾217(11)—ASSUMPTION OF RISK — CONTINUING WORK WITH KNOWLEDGE OF DEFECT.

Such member of such crew did not assume the risk incident to the defect in the step by continuing work with knowledge thereof, where the step was not the only one by which he could ascend the tender and his custom was to mount the tender from the other side.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 583.]

6. DAMAGES ⬾132(15)—PERSONAL INJURIES —INADEQUATE DAMAGES.

Where a member of the crew of a railroad construction train 27 years old and dependent upon his physical labor for the support of himself and his wife and children was crushed by the train, suffered greatly before medical attention could be given him, had to undergo two amputations of the leg, the second about halfway between the ankle and the knee, and, at the time of the trial, more than a year after the accident, the wound had not entirely healed, a verdict of $6,000 was inadequate, and would be increased to $7,500.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 396.]

O'Niell, J., dissenting in part.

Appeal from Second Judicial District Court, Parish of Bossier; John N. Sandlin, Judge.

Action by Gus M. Adams against S. H. Bolinger & Company, Limited. Judgment

for plaintiff, and defendant appeals. Modified and affirmed.

Stubbs, Theus & Grisham, of Monroe, for appellant. Stewart & Stewart, of Minden, for appellee.

PROVOSTY, J. Plaintiff was one of the crew of the defendant company's railroad construction and repair train on the defendant company's logging railroad. The men rode on the locomotive and tender in going to and returning from their work. On the day of the accident that has given rise to this suit, the train and tender and four flat cars, loaded with steel rails and wooden cross-ties, stopped at one of the camps of the defendant company in the woods, where there was a commissary store, to wait until a Shay engine, which was on a branch road that connected with the main line at this point, should come and remove some empty cars that stood in the way on the main line. The men got off of the train, and loitered around, and, meantime, as it was near the dinner hour, ate their dinner from out of their pails. The weather was somewhat cold, and a drizzling rain was falling. When the Shay engine came in sight, and the foreman, Arnold, gave the signal for all to get on the train, plaintiff was seated on a cross-tie at a fire which some one had built about 50 feet from the locomotive and about 30 feet from the track. When plaintiff reached the train it was in motion, and he was running. He grabbed the handhold of the tender to get on; his foot slipped from the step, and went upon the rail, and was crushed.

[1] The step was old, shaky, and loose, with an inward movement, and it was lower at one end than at the other, it having been in a wreck and been knocked backward; and to this defective condition plaintiff attributes the accident.

This defectiveness is contested by defendant, but is overwhelmingly shown; and it was unquestionably one of the contributing causes of the accident; and we agree with plaintiff that to have left in this condition this step which the men had to be constantly using for getting on and off of the train constituted negligence on the part of the defendant company, a violation of the rule which requires the employer to furnish the employé a safe place and safe appliances. The defect had existed amply long enough for defendant to have had knowledge of it.

Had the train been stationary, the slipping off of the foot would not have been attended with any serious consequences; hence the train's being in motion was another of the contributing causes of the accident; and defendant invokes the rule that to attempt to get on or off of a moving train is negligence barring recovery for injuries resulting therefrom.

[2] We have not been referred to any case where this rule has been applied to trainmen or to workmen expected to get on or off of a construction train without unnecessary loss of time, and we have found none in the limited research we have been able to make; but for such employés as for passengers it is more dangerous to get on or off of a train when in motion than when stationary, and is therefore an imprudence, unless induced by some good reason, and hence the rule ought to apply to them as well as to passengers.

However, the rule not being an arbitrary one, but founded on the imprudence of the act, its applicability to any particular case must necessarily depend upon whether under the circumstances of the particular case, the act was consistent with ordinary prudence. No one would doubt the rashness of an infirm old person attempting to board or get off of an express train under full headway; whereas hardly any one we imagine would deem it imprudent for an athletic young brakeman to get on or off of a slowly moving train. The rule and its limitations

are very fully and lucidly stated in 5 R. C. L. 36, and we find in Thompson on Neg., § 2856, the following statement of it with a qualification apposite to this case:

"It may be said here that whether or not it will be deemed negligence for a person to attempt to board a train, after it has started to move from the station, will depend upon the speed at which the train is moving, the physical condition of the passenger himself, and other surrounding circumstances. It is well known that trainmen habitually board their trains after they commence to move, and that passengers frequently do so; and it would seem to follow, from the mere consideration of this fact, that negligence cannot be imputed to such an act as a matter of law."

The question of negligence vel non on the part of the plaintiff will have, then, to be determined from the circumstances of the case.

Plaintiff was 27 years old, and in good health. Of his agility he says: "I didn't see anybody any quicker than I was." He attributes his having had to run and his having reached the train only after it was in motion to the shortness of the time allowed the men for getting on. Defendant says that he was slow in leaving the fire. The train was backing away from the fire, and was to go only far enough to clear the switch so as to, let the Shay engine get on the main line between it and the empty cars. If it was moving very slowly when plaintiff reached it, and he had lost no time after receiving the order to get on, but had hurried, his act in attempting to board it while it was moving would certainly not be negligence. If, on the other hand, plaintiff was slow in leaving the fire, as defendant contends, and the train had already attained some speed when plaintiff reached it, the act of plaintiff in attempting to board it would have been imprudent, and negligent, and would bar recovery. And there is also the question as to whether plaintiff knew that the step was defective.

We will now reproduce the testimony on these points, bringing together, in doing so, the parts that belong together, and substituting whenever occasion may require the noun for the pronoun, leaving out nothing that could change the sense or impart a different complexion.

It will be understood that the head of the train was towards the fire, and that the train backed when it moved, in other words, moved away from the fire, so that to the distance which plaintiff had to travel for reaching the tender must be added the length of the locomotive and whatever distance, if any, the tender had moved before he reached it.

"Mr. Dave Arnold, the foreman, he was down ahead of the train, and he said, 'All right, boys; come on.' He jumped up, and said, 'All right, boys; come on;' and I saw his hand in the air, and I knew what he meant, and the engineer and all of us ran, and Mr. Knight, who was my side partner, was a little ahead of me, and he got on just as it started. The engineer was between me and the engine, standing between me and the engine, on the ground. He ran and got on the train and never sat down, but just grabbed the throttle and turned it on at once. Q. How soon after he got up in the cab was it before he put the engine in motion? A. Not over two seconds, because he never sat down. Q. When you looked around and saw Mr. Arnold, your foreman, what was he doing with his hand? A. He was giving the signal to the engineer and to all of us; it meant for us to go to work. Q. How soon after that highball was given was it before you started to the engine? A. Just as soon as I could get there. You can have an idea about how quick you can move—well, just as quick as I could. Q. Then tell just what you did when you got to the engine? What did you do? A. I ran up and caught hold of the handholds and put my right foot on the step, and the step was loose and gave under the engine, and my foot slipped off. Q. Did you know at that time that this step was defective? A. No, sir; not until after I was hurt. Q. Had any of the steel gang gotten on this train ahead of you? A. Yes, sir; Mr. Knight had. Q. About how many composed that crew? A. Well, as a general thing, we had 20 hands in the track-laying crew. Q. Were there any of the men that had not reached the train when you got on? A. Yes, sir. Q. You say that Mr. Knight had got on? A. Yes, sir. Q. Do you know of anybody else? A. No, sir; I don't; the engineer got on. Q. That left a good many to get on after you got there? A. Yes, sir. Q. What was the first order that you heard ordering or authorizing you to get on the train? A. Mr. Dave Arnold hollowing, 'All right, boys.' Q. How soon after he said that did he give the engineer orders to start? A.

Just as fast as I am talking now, 'All right, boys; come on, Ike.' Q. Ike was the engineer? A. Yes, sir. Q. Then how soon after that did the engineer put the train in motion? A. Just as soon as he could run it over; it wasn't many minutes, I mean, it was not many seconds."

On cross-examination he said:

"Q. About how fast was that train moving? A. Not so very fast—I stepped up on it and it started. Q. Had you never used that step before the accident? A. Yes, sir; one time. Q. Did you notice anything wrong with it at that time? A. No, sir; the train was standing still. A crowd of us were getting in out of the rain and we stepped up there. Q. And at that time you never noticed anything wrong with it? A. No, sir. Q. About how far was the train from the fire? A. About 35 feet. Q. At what point was it that Dave Arnold gave the signal to move the train? A. He was standing down in front of the train, back of the train as it was going, in front of the two cars. Q. Now, is it not a fact that all around that fire information was given that the Shay engine was coming and would clear that track, and that Mr. Arnold told the crew to get aboard the engine, and walked down towards the engine? A. No, sir; not that I know of; the first thing I heard was just what I told you, when he said, 'All right, boys; come on, Ike;' and that's what the people that I talked with say that they heard. Q. Was not Mr. Arnold, the foreman, around there at the fire with the crew until the Shay engine made its appearance? A. No, sir; he walked off and hollowed at us to come; he walked off, another man and him. Q. About how many members of that crew were there that had not gone on the tender or into the cab at the time of this accident? A. Several; I don't know just how many—there were some got on—my partner got on, and I was trying to get on behind him. Q. Can you tell me of any one who failed to get on before you did? A. Yes, sir; there was a negro by the name of Gates, he was coming behind me, and another boy by the name of Lonnie Johnson didn't get on, and I don't know who else didn't get on, but I know that they didn't get on. Gates came up to where I was and stopped and looked at me, and went around shaking his hands; he said that he wasn't going to attempt, or try to make no attempt, to get on after he saw that I was hurt. Q. Is it not a fact that Mr. Arnold, when he left that fire where you were all sitting, directed that the crew get aboard of that engine, and walked down in front and gave the signal? A. No, sir. Q. You are positive of that? A. Yes, sir; the last words he said when he left the fire—he told that fellow that he had had enough of his foolishness. Q. And you are positive that he was down on the side of the track when he said 'All right, boys?' A. Yes, sir; headed that down side of it. Q. Mr. Adams, was this step wet or dry at the time of this accident? A. It was wet, bound to be, for it had been standing there,

and it had been raining all day, and everybody's feet was muddy; I had waded water over my shoe tops that morning, and I know that it was wet. Q. Wet, muddy, and slippery? A. Yes, sir."

On redirect examination he said:

"Q. Had you ever had any warning as to getting on and off of that train when it was moving? A. No, sir. Q. How often did you have to run to get on the train when it was moving, how often before this? A. Once or twice that I would be just taking my time, and all the rest would get ahead of me, and I would sometimes have to run to catch it and get on."

Jim Knight, witness for plaintiff, testified:

"Q. How far was it from this fire to where the engine was standing? A. It was something like 35 or 40 steps. Q. Where were you when the order was given? A. Right across on the spur, across the main line, on the south side of the track. Q. Were you nearer the engine than Gus was? A. Yes, sir. Q. Who gave the signal for the train to pull out? A. Mr. Arnold. Q. How far was he from you when he gave the signal? A. Something like 100 yards. Q. What was he doing at that time? A. He was down on the spur, waiting for the Shay to come in. Q. When he signaled that train, what did he say to Ike? A. He said, 'All right, Ike.' Q. What did that mean? A. To go ahead. Q. What did Ike do? A. He ran and got on the engine and turned it on pretty quick and started. Q. Did the engine move out at once, and pretty fast? A. Yes, sir. Q. When he said, 'All right, Ike,' you jumped on? A. Yes, sir; I was right behind the negro Ike when he got on. Q. Mr. Knight, did you see Gus Adams trying to get on that train? A. Yes, sir. Q. Was the train moving when he started to get on? A. Yes, sir. Q. How fast? A. Well, I don't know at what rate, but it was pretty swift."

On cross-examination he said:

"Q. About what rate of speed would you say that engine was moving at the time that Mr. Adams had this accident? A. I couldn't say, but it was moving pretty pert. Q. Do you think that it was moving as much as 3 or 4 miles an hour? A. Faster than that. Q. Estimate it. A. I tell you, I would hate to do that; that would be guesswork on my part. I could make a guess, but I might miss it. Q. I understand that you cannot tell exactly, but as a man working around that engine, give me your estimate as nearly as you can. A. Well, I would say that the engine was probably moving something like 10 or 15 miles an hour, at that rate, when Gus got there. Q. About how far had the engine gone, or moved, from the place where it was standing stationary when this 'Go ahead' signal was given, before Adams caught it? A. About 30 or 35 steps, something like that. Q. And

about how far did it go before it was brought to a stop? A. It didn't go any farther than that negro could stop it, as quick as he could have, maybe one or two rail lengths; he shut the engine down as quick as he could. Q. Do you remember about how many men were in that crew, that steel crew? A. Well, just how many there were that day I don't remember; there were some 10 or 12 men in the gang, the best I remember; sometimes we had as high as 20 and sometimes as low as 6 or 8. Q. About how many of that crew had gone on to the engine, or locomotive, before Mr. Adams was hurt? A. Well, there was something like 4 or 5 men on the engine, some had gotten on running when the engineer got on it. I got on just behind—2 or 3 of us got on running, when the engineer did—got on it by the time it got to running good; I got on behind, just behind him, and the engine was not running then, was not moving then. Q. About how many of the crew do you think were left on the ground at the time that Gus Adams was hurt? A. Well, there was 3 or 4, maybe 5, something like that, on the ground."

Lonnie Johnson, witness for plaintiff, testified:

"Q. Well, who gave the order to go out and work when the log train came in, after it came in? Who ordered your train to pull out? A. Dave Arnold. Q. Where was he when he gave the order? A. He was up at the head of the engine. Q. Do you know where the fire was that some of the hands were warming by? A. Yes, sir; it was below the camp. Q. Which way was Mr. Arnold from that fire? A. Up the track. Q. Was the train, the steel train, between the fire and where Mr. Arnold was? A. Yes, sir. Q. Where were you located when the order was given to move? A. I was right behind Mr. Arnold. Q. You were in front of the train? A. Yes, sir; I was walking along by the side when he got the signal. Q. What order did Dave Arnold give? A. Why, he just waved his hand to the engineer and told him, 'All right.' Q. What did he call the engineer? A. Ike. Q. What did he say to him? A. He just hollowed, 'All right, Ike.' Q. What did he say to the hands? A. Nothing. Q. Did you see Mr. Adams when he got his foot cut off? A. No, sir; I didn't see him. Q. Had you gotten on the train? A. No, sir. Q. How many of the steel gang had gotten on? A. I don't know. Q. Were most of them on? A. Yes, sir."

Harvey Johnson, for plaintiff, testified:

"Q. Did Mr. Arnold give any signals that day? A. The only one he gave was he hollowed out to the engineer to get on, to come on. Q. Did everybody go and climb into the cab then? A. Some of them did, and some of them didn't; there was a good many of them there. Q. Do you remember how many were there when the train started? A. No, sir. Q. But you know that Gus Adams was left, and some others? A. Yes, sir; he made a catch at the train, but failed to catch it. Q. How fast was it running when he made this catch? A. I don't know, tolerably swift, but not so much. Q. Do you judge that it was running 3 miles an hour, or faster? A. Faster, I suppose. Q. How much faster than that? A. I reckon it was running something like 4 or 5 miles an hour."

On cross-examination he said:

"Q. About how far was the fire from the engine? A. Something like 20 steps. Q. Now, about how many of that crew had gotten on that engine? A. I don't know, part was on and part of them was not; I don't know about how many. Q. How many got on before it started? A. Well, I ain't positive that any did—they was by the fire—the engineer did, sure. Q. And he is the only one that got on before it started? A. He is the only one that I am positive of. Q. You are not positive that any others did? A. No, sir. Q. How many were on there when Mr. Adams tried to get on and got hurt? A. I don't know how many there was; there was part of them on and part of them wasn't—most of them were on—I don't know how many of them there was. Q. Where was that engine to stop the next time? A. At the switch. Q. How far was that from this place? A. Not very far. Q. About how far? Estimate it. A. Something like 200 yards. Q. Do you know where Mr. Arnold intended to get on there? A. At the switch, I suppose; he was walking ahead."

On redirect examination, he said:

"Q. How many people were standing around the fire warming? A. I do not know. Q. Estimate how many you think. A. I will say, between 8 and 12. Q. Were they all there when Mr. Arnold said, 'Come'? A. Yes, sir. Q. Did you-all make a rush for the train then? A. No, sir; part of them did. Q. Was Mr. Arnold ahead or behind the engine when he said for them to get on the train? A. The engine was going backwards; he was the way the engine was going. Q. How far was he from the engine when he told them to 'Come on'? A. I estimated it to be about 20 or 25 steps, flagging the engineer. Q. Do you remember who was the first one that got on the engine? A. No, sir. Q. Do you remember whether it was the engineer? A. Oh, yes, sir; the engineer went first to the train. Q. Did he run as soon as Mr. Arnold told him to go ahead? A. Yes, sir. Q. He was at the fire, but left immediately upon Mr. Arnold telling him to get aboard the train? A. Yes, sir; went and got on when he hollowed at him to go. Q. Do you remember whether he walked or ran from the fire to his cab? A. He is pretty lazy, so I expect he taken his time; I don't expect he run. Q. He left the fire immediately upon Mr. Arnold telling him to get aboard the train, got on and started out? A. Yes, sir; he started up and went in a leisurely gait; he wasn't in no hurry; of course he didn't stand around and talk about it."

John Combs, witness for defendant, testified:

"Q. Mr. Combs, did you notice about how far this fire was from the place where Mr. Adams was hurt? A. I would judge that it was 65 or 70 steps. Q. About how far, if you remember, had the engine moved from the place where Mr. Adams was lying when you got out there? A. Do you mean how far the engine moved? Q. Yes. A. Just a few steps, to the best of my recollection; it had not moved very far."

Dave Arnold, witness for defendant, testified:

"Q. How far was this fire from the engine? A. I guess, 50 yards, a little more or less. Q. Was it directly out to the side, or on to the front? A. It was back behind the engine; we was running backwards—the fire was on the front of the engine, and we was going from the fire. Q. About how far was that fire from the railroad track? A. I suppose 30 feet, maybe not so much; about that, I guess, a short distance. Q. What did you do when it became time for your train to move? A. Well, I got up from the fire and told the boys to 'Let's go,' and I went around to the engine. I went to the engine, passed around the two cars, and gave the engineer the signal to come back; I walked along in front of it and flagged him on back of me. Q. Where were you standing when you first gave orders to your crew, or gave them notice that the engine was going to move? A. Right at the fire, and I left it. Q. What did your steel crew do when you gave those orders? A. There were only about 3 or 4 there, the rest was mostly on the engine; there might have been one or two in the commissary. Q. Well, those around the fire —what did they do? A. One of them followed me, and the other two stayed there for awhile. I don't know how long; I never looked back to see whether they came or stayed, and I don't know nothing about it, but one of them got on the engine with me. Q. About how much farther did you go before you gave the signal to move the engine than it was from the fire to the engine? A. I could not tell you precisely the distance from the fire to the engine, but it must have been 50 feet or more. Q. And how much greater a distance did you go before giving the signal to move than it would have been necessary to go from the fire to the engine? A. Well, it was about, I guess maybe 100 or 150 feet from the fire to where I gave the signal, somewhere near that. Q. Did you run or walk? A. I walked, I did not run. Q. Where was the engineer when you gave the order? A. He was on the engine. Q. What did Mr. Goodman say to you? A. He told me that he had seen the Shay coming, and I got up and told the boys, 'Let's go; get on boys;' or something like that. Q. Where was Mr. Adams at that time? A. He was sitting by the fire with me. Q. Where was the engineer? A. I could not swear; when I got to the engine he was on it. Q. When you made the statement, where did you go? A. I went down the side of the train. Q. About how far from where the fire was? A. Well, it must have been 250 or 300 feet, the back end from the fire. Q. And what did you do then? A. I flagged the engine back. Q. Now state whether or not Mr. Gus Adams and the other parties who belonged on that train had time, ample time, to get on there from the time that you told them to leave the fire until you flagged. A. If they had started when I did, they would have had plenty of time. Q. How far did you go beyond where the engine was standing before you flagged? A. About 100 feet or more, two steel cars, two tie cars, and an engine, something over 100 feet. Q. Was it as far from the fire to where this engine was as it was from the engine to where it was when you flagged it? A. There wasn't much difference; it differed some, it was farther from the engine back to where I went. Q. And, as I understand it, you had gone about twice the distance as it was from the fire to the engine? A. Somewhere near it, not much difference."

On cross-examination he said:

"Q. When you told those boys to get ready, what did you mean for them to do? A. To get on the engine. Q. And you walked on up, about how far before you signaled the engineer to go ahead? A. About 1,250 feet, maybe more, maybe not so much. Q. When you gave the signal to the train to pull out, did they have plenty of time to get on? A. I went twice the distance. Q. Had it not been the custom of the men to get on that train after it had started? A. That was not the custom, but I have seen them do it, but I fired two on account of it. Q. When you flagged them they rush to get on? A. They got on. Q. They always made a rush? A. None of them ever run much, they generally got up and moved out. Q. Some of them would get on after that train would start? A. Yes, sir; they have done that, and I have fired a couple of them on account of it. Q. Did you fire every man that ever did that? A. No, sir; but it was my orders not to catch it running. Q. Did you ever tell Mr. Adams that? A. I don't remember of it, but the old hands knew it. Q. He was an old hand? A. No, sir. Q. How long had he been working for you? A. A short time; I don't know."

Ike Ward, the engineer, witness for defendant, testified:

"Q. Ike, who gave you orders to move that engine? A. Mr. Arnold. Q. Where was he when he first notified the crew, or told them that the train was going to move? A. He was standing right on the track. Q. What did he do? A. He said 'All right, boys; come ahead,' or 'Let's go;' and he passed on right by the engine, and I went right behind him. Q. To where did he go? A. Right on front of the engine where the cars go. I got in the engine, and

he flagged me to run. Q. Where were you standing as to that fire when Mr. Arnold notified them to get aboard of the train the first time? A. I was just standing a distance off about 12 feet. Q. Where was Mr. Adams at that time? A. He was sitting down by the fire. Q. About how far was that fire by the railroad track? A. About, I reckon 15 feet. Q. What was the first knowledge you had that he was hurt? What caused you to know? A. Why, the boys hollowed and told me, them that was in the cab. Q. Who, besides Mr. Gus Adams, if any one, that belonged on that engine, with that crew, that had not gone on? A. I don't remember no more than Mr. Dave and Nias Gates, those three, and Mr. Allen, those three. Q. Well, now, where were Mr. Adams and Nias Gates at the time that you left to get on the engine? A. Sitting by the fire. Q. How close was Mr. Arnold to them when he gave the orders that the train was going to move? A. He was right along of the track, and he was sitting right over there, and he was right straight in front of them when he said, 'All right.'"

On cross-examination he said:

"Q. Now, Ike, do you know, as a matter of fact, that Mr. Arnold walked up that track for something like 100 or 150 feet, and when he heard the Shay coming, did not say 'All right, Ike'? A. I don't remember where he was at. Q. But is not that true? A. I don't know, sir, but the time I remember he was standing right opposite me, and he said, 'All right, boys; get ready to go.' Q. You did not get on the engine until he walked up there to see whether that engine was coming or not? A. No, sir. Q. So, he got about 150 feet before he said, 'All right, boys,' or, 'All right, Ike'? A. No, sir; he was standing close by; he just said, 'Get ready, boys,' and then walked up there and flagged. Q. Ike, how long after Mr. Arnold gave you that signal did you get on that train? A. I reckon that he had walked the length of the car after he told me, but I didn't get on until he signaled, and I then got up in the engine, and I said, 'All right, boys, let's go.' Q. That was after Mr. Arnold said, 'Let's go'? A. Yes, sir. Q. Did you put on that steam pretty hard? A. Yes, sir; we had good brakes on. Q. And you opened hard up—before you jumped on that engine what did you do? A. I opened it up light besides I was watching him. Q. What did you have to watch him for? A. He was flagging me for the slow flag. Q. Would you have stopped at all if this man had not got hurt? A. Yes, sir; up at the corner of the switch, on account of some cars up there, right up there on the head of the switch. Q. Did you stop because Mr. Adams got hurt? A. Oh, yes, sir; that's why we stopped then. Q. How far did you run after Mr. Adams got hurt? A. Just about the length of the engine. Q. How many feet is that? A. About 14 feet, I guess, just a boiler, not a tank. Q. Who told you to stop?

A. Those boys hollowed. Q. You were not ready to go? A. No, sir; we was just going to move up a few feet and stop up there. Q. Is it not a matter of fact that when the boss said to go, you would go whether anybody was on or not? A. Yes, sir; when I looked. Q. You did not look to see if Mr. Adams got on? A. I wasn't looking. Q. When you got on and pulled that throttle, you did not look back to see who was getting on? A. No, sir. Q. Is it not a matter of fact that when Mr. Arnold said, 'Let's go, boys' you got on that engine and started, and those people had to climb on whether you were going or not? A. Yes, sir. Q. They got on lots of times after you started? A. Some of them would, but not going fast. Q. A good many times when you moved that engine off, when Mr. Arnold would tell you to, those men would run and would not be on there until after you started? A. Some of them would be on there, and some of them would not. Q. And they would get on after you started? A. Yes, sir. Q. A good many times? A. Yes, sir."

J. P. Lamb, witness for defendant, testified:

"Q. About how far was that fire from the locomotive? A. Why, I suppose it was 40 or 50 yards. Q. And about how near to the railroad track? A. Well, I suppose it was 10 or 12 yards, or something like that. Q. Just before that train moved out on that evening, did you hear Mr. Arnold, the foreman, say to that crew to move out and get aboard of the train? A. I never heard Mr. Arnold say nothing; himself and Mr. Goodman was out on the railroad, and he told—Mr. Goodman told Mr. Arnold that the Shay was coming, and to get back out of the way. Q. Where was Mr. Arnold standing at that time as to the fire? A. He was standing by the fire, and Mr. Goodman was on the railroad about 8 or 10 steps away. Q. Did you hear Mr. Arnold say anything then? A. No, sir; I just seen him start to the train. Q. Was he sitting down at the fire at that time? A. Yes, sir; around the fire. Q. Did you see the notice that all the men got to board the train? A. When I heard the train start I seen two men get up and go running towards the train, Mr. Adams and Price Gates. Q. Was that before or after the train started? A. Just about the time it started, I think. Q. About how far did Mr. Adams have to run to catch the train? A. I suppose it must have been 75 yards, or maybe 80 yards, or somewhere there; he came across the track from where he was sitting on the opposite side, to catch the train. Q. At about what rate of speed was the train going? A. I couldn't tell you, but it could not have been going fast; it had only gone about 20 or 30 yards. Q. About how far did it go from the place where Mr. Adams was hurt before it came to a stop? A. I couldn't say, it got in the clear so that the Shay could get by."

Mrs. J. P. Lamb, witness for defendant, testified:

"A. The first I noticed, he was running to catch the train; the train had just started off before he caught the train, and his foot slipped, and he said, 'Those rubber-soled shoes was the cause of me slipping.' Q. How far did he run until he caught the train? A. Not very far. Q. Did you see this young man when he grabbed those grabirons on that engine? A. Yes, sir. Q. What was the engine doing? A. It was just rolling along slowly, just starting off. It wasn't running fast."

Henry Hayes, witness for defendant, testified:

"Q. Was there a fire there? A. It was just about 40 or 50 or 75 yards from the engine. Q. Was it before or after he was hurt that you saw him sitting on the tie? A. Seen him running from the fire, getting on the engine. Q. About how far did he run before he caught up with the engine? A. He must have run 40 or 50 yards. Q. How fast was that engine moving? A. About 3 miles an hour, I guess. Q. After you had backed in there, you saw Mr. Arnold? A. Mr. Arnold got up from the fire by the side of the train and went to flagging. Q. You saw Mr. Arnold and who else at the fire? A. The whole crew nearly was at the fire. Q. There were 10 or 15 men? A. I don't know, there must have been 7 or 8 or 10 of them, but most of them got on the engine while it was standing there, and some of them stayed there. Q. How far had Mr. Arnold gone from this fire when you saw him signal the engineer? A. At least .75 yards. Q. He was walking the way that the engine was going to move? A. He walked on back past the engine and flagged. Q. And then the engine began to move? A. Yes, sir; to move back slowly. Q. How far did it move before it stopped? A. It must have went 100 feet. Q. How far was this train standing when Mr. Arnold left the fire? A. It must have been 40 or 50 feet from the fire."

It will be noted that the distance from the fire to the engine and the distance Arnold the foreman had attained beyond the train when he signaled it to move, as well as the speed of the train, are variously estimated by the witnesses, and even by the same witness.

Thus Mr. Arnold first said:

"The distance from the fire to the engine must have been 50 feet or more"; and "it was about I guess maybe 100 or 150 feet from the fire to where I gave the signal."

This was on the witness stand in open court. He was taken with a chill, and the rest of his testimony was given later in his room at the hotel. There he said:

"I went down the side of the train. Q. About how far from where the fire was? A. Well, it must have been 250 or 300 feet, the back end [of the train] from the fire. Q. How far did you go beyond where the engine was standing before you flagged? A. About 100 feet or more, two steel cars, two tie cars and an engine, something over 100 feet. Q. Was it as far from the fire to where this engine was as it was from the engine to where it was when you flagged it? A. There wasn't much difference; it differed some, it was further from the engine back to where I went."

Whereas on cross-examination he said:

"Q. And you walked on up, about how far before you signaled the engine to go ahead? A. About 1,250 feet, maybe more, maybe not so much."

[3] An analysis of the testimony of all these witnesses in detail would be too lengthy, and serve no useful purpose. We gather from it that this construction train with its gang of men was losing time waiting for the Shay to come and remove the obstructing empty cars, and that the foreman Arnold and the woods foreman Goodman were more or less impatient at the delay; that Goodman went up the track some distance to watch for the coming of the Shay, and, as soon as he saw it, signaled to Arnold, who was then standing either close to the fire or on the track opposite to it, and that Arnold at once gave the order to the men to get on the train, and immediately started ahead to give the signal to the train to move; that plaintiff was somewhat slow in starting for the train; either because he was seated while the others were standing, or because he did not hear Arnold's oral order to get on, and did not know that the train was about to move until he saw the signal given by Arnold for it to move. That whatever the distance was which plaintiff had to travel from the fire to the tender, and whatever time may have been allowed the men to get on before the signal was given to the train to move, the train was barely

started, or, at any rate, moving but very slowly, when plaintiff reached the tender. In the first place it was not to go far, but only to clear the switch—perhaps 200 or 300 feet. The engineer says:

"We was just going to move up a few feet and stop there," and that Arnold "was flagging me the slow flag," and that the train "ran just about the length of the engine, about 14 feet," after plaintiff was hurt.

The witness Combs says the train traveled in all "just a few steps." The witness Lamb says "20 or 30 yards," and Mrs. Lamb says, "It was just rolling along slowly, just starting off."

We do not think that the attempt of this young workman, who had climbed this tender perhaps a hundred times during the three months he had been at this work, to board this slowly moving train can be said to have been a thing which an ordinarily prudent man young and agile would not have done in his place. The evidence shows that this getting on the train while in motion was not an unusual thing for the workmen to do; and everybody knows that trainmen get on and off of slowly moving trains as a common practice.

[4] As to plaintiff's knowledge of the defect in the step. He testified that he had used this step but once, his custom and that of his partner Knight having been to get up on the other side of the tender, for reasons which he explains, and that he had not then observed the defect. But granting that he had knowledge of it, nothing shows that this knowledge was present to his mind at the moment when in his precipitancy he sought to use this step. The danger was not an obvious one, one that would obtrude itself upon any one's attention. Even if it had previously attracted his attention, it did not do so at the moment, and if he had forgotten about it, this would not necessarily constitute negligence on his part. "Temporary forgetfulness of a known danger does not constitute contributory negligence as a matter of law." 29 Cyc. 519.

In Harker v. Burlington Ry. Co., 88 Iowa, 409, 55 N. W. 316, 45 Am. St. Rep. 242, the Supreme Court of Iowa quotes from 1 Shearman & Redfield on Neg. § 213, as follows:

"The mere technical fact of the servant's knowledge of a defect is not sufficient to exonerate the master if, for any reason, the servant forgets it, and is not in fault in forgetting it, at the precise time he suffers thereby. In analogy to the principles already stated under the head of 'Contributory Negligence' the servant's rights are not prejudiced by his forgetfulness or failure to observe a defect, under the influence of sudden alarm, or of an urgent demand for speed, or if his duties are such as necessarily to absorb his whole attention, leaving him no reasonable opportunity to look for defects."

See Ann. Cas. 1913B, 1197, where the cases are extensively collated, and the rule stated:

"Measured by the standard of care of an ordinarily prudent person, forgetfulness by an employé of a known danger cannot, irrespective of circumstances, be regarded as indicating that he is negligent. Only an infallible person never forgets."

[5] As to plaintiff's having assumed the risk incident to this defect, if he knew of the defect, we do not see that this either would bar his recovery. This step was not the only one by which he could ascend the tender or the engine; and, as already stated, his custom was to mount the tender from the other side. It would hardly be expected that a young man would give up an employment of which he stood in need, because of a danger from which he had as little reason to apprehend injury to himself as plaintiff had from the defective condition of this step. The rule applicable in such a case may be stated as follows, quoting from 26 Cyc. 1196:

"Where he knows, or in the exercise of reasonable or ordinary care should know, the risk to which he is exposed, he will, as a rule, be held to have assumed them; but where he either does not know, or, knowing, does not appreciate, such risks and his ignorance or nonappreciation is not due to negligence or want of due care on his part, there is no assumption of risk on the part of the servant preventing a recovery for injuries."

[6] Plaintiff was allowed $6,000 by the jury. He asks for an increase to $7,500. He suffered greatly before medical attention could be given him, and thereafter had to undergo two amputations of the leg, with all attendant shock and sufferings, the second or last about halfway between the ankle and the knee. After more than a year, at the date of the trial, the wound had not yet entirely healed. He depends for the support of himself and wife and children upon his physical labor. We think the increase ought to be granted. Bell v. H. & S. Ry. Co., 132 La. 88, 60 South. 1029, 43 L. R. A. (N. S.) 740; Collins v. Krause-Managan L. Co., 136 La. 303, 67 South. 12.

The judgment appealed from is therefore increased to $7,500, and, as so increased, is affirmed, with costs.

O'NIELL, J., is of the opinion the judgment appealed from should be affirmed.

### On Application for Rehearing.

PER CURIAM. The judgment of this court herein is amended so as to read as follows:

The judgment appealed from is therefore increased to $7,500, and, as so increased, is affirmed, with costs, legal interest to run on said increase from the date of the judgment of this court.

Rehearing refused.